ELIZABETH H. COLOMBO, PLAINTIFF, v. NETTIE J. PETERS, FREDERICK JAMES, EDNA V. JAMES, CARLO BUCCERI AND RUTH M. BUCCERI, DEFENDANTS.

Superior Court of New Jersey
Chancery Division

Decided October 27, 1954.

*Mr. Samuel A. Wiener,* attorney for plaintiff.

*Mr. Joseph J. De Luccia,* attorney for defendants.

SULLIVAN, J. S. C. This is a lateral support case involving adjoining property owners. Plaintiff charges that defendants caused or permitted soil or fill to be dug and removed from their lands, thereby removing the lateral support due plaintiff's property. Plaintiff seeks a mandatory injunction to require defendants to erect some suitable retaining wall or cribbing so as to furnish lateral support for plaintiff's property. Damages are also demanded.

The testimony presented at the trial established that the digging and removal of fill was begun on the easterly or front end of the property now owned by defendants about 30 years ago and continued intermittently for 10 or 15 years, the purpose being to level off the land at approximately street grade. When these operations ceased about 1940 the prop-

erty had been dug out or levelled to slightly more than one-half its entire depth and there existed to the same depth a 15-foot-high embankment running more or less along the dividing line which separated the plaintiff's and defendants' properties. We are not concerned with the old excavating or the old embankment except that there is some dispute as to how far back the old embankment ran. In late 1948 or early 1949 further digging and removal of fill was commenced and also continued intermittently until about February 1952. Since then all digging has ceased and no further digging is contemplated. Since the digging was into a sloping bank or side of a hill the depth of the new excavation varies from about 15 feet to about 30 feet. Generally, the excavation continued westward along the property line that divided plaintiff's and defendants' lands. The excavator, however, stayed between 15 feet at the shallow end to 35 feet at the deeper end away from defendants' northerly property line. The result is an embankment varying in height from about 15 feet to about 30 feet and also varying in width from about 15 feet at the shallow end to 30 or more feet at the deeper end and running along defendants' northerly property line but entirely on defendants' side of the boundary. Actually this embankment is merely a continuation of the old bank which came into existence many years ago. The distance between the top of the embankment and the property line varies between two to nine or more feet. Plaintiff offered proof that at two points, both of which are about 300 feet back or westward from the front of defendants' property, the top of the embankment actually reaches plaintiff's southerly property line. She further claims that excavating had been done at these points during the year 1952. The court, however, has determined that this area is a part of the old bank which has existed for 15 or more years and that at no point does the new bank come within two feet of the boundary line.

Plaintiff concedes that as yet none of her land has subsided or collapsed. What she is fearful of is that there will be a subsidence or collapse of her land in the future because the

embankment is so close to her property. She claims that the bank has not yet stabilized and that the top of it will continue to recede until it reaches its natural angle of repose, but that in the process of doing so, part of her lands will necessarily subside or collapse. Plaintiff's expert estimated that the top of the bank would recede about ten feet before the embankment would come to a state of repose. He also testified that to hold the bank in its present location it would have to be reinforced with cribbing at an estimated cost of $15,000. Defendants' expert on the other hand said that the bank was already in a state of repose and that he did not expect any material change in the contour or position of the bank in the future. He pointed out that it had been standing for at least three or four years and was now fairly heavily overgrown with vegetation which of itself is strong evidence of a stable bank. The substance of his testimony was that the bank would stay the way it is. Other witnesses testified to the same effect, the consensus being that the bank had not changed materially over the past two or three years and had recently weathered two (three) hurricanes without ill effects.

■■ Turning now to plaintiff's claims for relief we find that the count for money damages must fail because plaintiff has as yet suffered no damages. The right to lateral support is the right to have one's land supported so that it will remain in its natural state and will not fall away or subside. *McGuire v. Grant*, 25 *N. J. L.* 356 (*Sup. Ct.* 1856). Until, therefore, plaintiff's land actually subsides or falls away, there has been no damage. It is true that plaintiff's real estate expert estimated that plaintiff's property had depreciated between 10% and 15% in value because it would be impossible to make full use of it. This witness' testimony as to damage however was predicated on the supposition that in the future the southerly side of plaintiff's lands would subside and that therefore that part was presently unusable. Such testimony cannot be accepted. It is entirely too speculative. As a matter of fact, the plaintiff has made use of her land right up to the property line and there is no evidence that any part of her property is presently unusable.

Unless or until there is an actual subsidence of plaintiff's lands she cannot maintain an action for damages. At present, therefore, her claim for money damages to compensate her for what may happen to her property in the future is at best premature.

3 *Tiffany, Real Property* (*3rd ed.*), § 752, *page* 187, states:

"This right of lateral support involves no right to have the neighboring land remain in its natural state or position, but merely the right to have one's own land remain in its natural position. Consequently a landowner cannot complain of the making of excavations on the neighboring land, provided measures are taken, by the substitution of artificial support, to prevent the falling away of his own land, and *there is no right of action for damages* on account of such excavations on neighboring land, although they are such as may reasonably be expected to cause a subsidence of one's own land, *until such subsidence actually occurs.*" (Italics mine.)

*McGuire v. Grant, supra,* at *page* 368:

"The decided weight of authority and sound principle concur in support of the position, that there is incident to land, in its natural condition, a right to support from the adjoining land; and that if the land sinks or falls away in consequence of the removal of such support, the owner is entitled to damages to the extent of the injury sustained."

 It is, of course, true that even without actual subsidence, if a plaintiff establishes that her neighbor has removed the lateral support due her lands and there is imminent danger that plaintiff's lands will cave in and damage will result, a court of equity could order the defendant to supply artificial lateral support at his own expense. *Gerhard v. Fichter,* 12 *N. J. Super.* 265 (*Ch. Div.* 1951). This relief would be in the nature of a mandatory injunction and is of such a drastic nature that it is only awarded where plaintiff's claim has been clearly established and the threatened injury shown to be irreparable. 4 *Pomeroy, Equity Jurisprudence* (*5th ed.*), § 1359a.

██ Plaintiff's claim for injunctive relief fails to measure up to either of these requirements. After hearing all of the

evidence in this case the court is not satisfied that the lateral support due plaintiff's lands has been removed and that her property is going to cave in or subside. The excavation on defendants' property complained of is at least two and possibly three or four years old. As yet none of plaintiff's land has fallen into this excavation and there are persuasive indications that at the present time the bank is stabilized. If so, it would be an injustice to defendants to put them to the expense of cribbing this entire embankment at an estimated cost of $15,000, to prevent something that will not occur. It would be far better to wait and see whether plaintiff's fears are actually realized. She always has a right to seek reimbursement for any damage she may suffer. This is all the more so because there has been no showing that this damage which plaintiff fears will happen is irreparable in nature. *Weisberger v. Maurer*, 9 *N. J. Misc.* 117, affirmed 109 *N. J. L.* 273 (*E. & A.* 1932).

The several buildings on plaintiff's lands admittedly could not be damaged by any possible subsidence because they are all 40 or more feet away from the southerly property line. In addition, plaintiff's lands are part of the side of a hill and in keeping with the terrain, most of her property is presently used for casual agricultural purposes. To develop her property to any extent would require extensive grading and levelling. This is best indicated by the fact that when plaintiff built a home for her daughter on the rear of her property it was necessary to excavate several feet into the side of the hill in order to level off the plot. It would seem, therefore, that any damage which plaintiff might suffer would not be of an irreparable nature but would be more of a technical invasion of her property rights than anything else.

There will be a judgment for defendants reserving to plaintiff the right to sue for damages if her property actually falls in or subsides.